UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                   )
UNITED STATES OF AMERICA           )
                                   )
    v.                             )    CRIMINAL NO.  05-10104-MLW
                                   )
JOSHUA T. ANDUJAR,                 )
                                   )
            Defendant              )
_____)

**GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM AND OPPOSITION TO DEFENDANT'S MOTION FOR DOWNWARD DEPARTURE**

The United States of America hereby responds to Defendant's Sentencing Memorandum and opposes Defendant's Motion for Downward Departure, which Andujar addresses in his memorandum.  In his memorandum, Andujar advances four arguments, which are re-ordered here for ease of presentation.  Andujar makes two related mental health arguments: (1) that his bipolar disorder warrants a diminished capacity departure; and (2) that his bipolar disorder warrants a variance from the GSR because it would be unjust to assign criminal history points for committing offenses on supervised release to an offender who committed his crimes while in the throes of his mental illness.  Andujar's remaining two arguments are (1) that including uncharged conduct in the loss calculation under the Guidelines violates Apprendi and its progeny;[1] and (2) that a role adjustment based on special skill or abuse of trust is unwarranted.

As discussed more thoroughly below, Andujar's mental health arguments are without basis in fact or law.  First, as set forth in the PSR (and undisputed by either party and by the defendant's expert), Andujar was receiving appropriate medication and other medical care for

---

[1] It is unclear whether Andujar challenges the factual basis for finding a total intended loss in the amount of $166,747, see PSR ¶28, or whether he merely challenges the Court's authority to find loss beyond the specific counts of conviction.

his bipolar disorder during the entire period of his criminal conduct. Moreover, the complexity of Andujar's scheme undermines his claim of diminished mental capacity.

With regard to the defendant's argument, citing <u>Apprendi</u>, that the Court lacks authority to include uncharged conduct in its loss determination, the First Circuit has made clear that this Court has the authority to determine the factual basis for guidelines enhancements, including those based on relevant conduct, so long as the Court treats the guidelines as advisory and does not increase maximum statutory penalties. Finally, the government takes no position regarding the Probation Office's advocacy of an adjustment based on special skill or abuse of trust. Rather, as set forth in the plea agreement and discussed in the Government's Sentencing Memorandum (Docket Entry No. 52), the government advocates an enhancement to the offense level pursuant to U.S.S.G. § 2B1.1 (b)(8)(C) because the crime involved "sophisticated means."

## I. BACKGROUND: ANDUJAR'S HISTORY OF BIPOLAR DISORDER

There is no dispute that the defendant suffers from bipolar disorder. In a report the defendant submitted to the Court, Dr. Paul Spiers states that Andujar's original diagnosis of bipolar disorder was in 1995. Spiers Report at 4. As Dr. Spiers explains, during treatment in 1995, Andujar "responded well to . . . medications [lithium and depakote], became less manic and was noted to be only a little 'hyperverbval' when he was discharged." <u>Id.</u> Dr. Spiers then traces Andujar's treatment history from 1995 to 2000, through periods when Andujar occasionally stopped taking lithium and, as a result, relapsed into a manic state. <u>Id.</u> at 5. Dr. Spiers explains that, "so long as he was being followed in treatment and taking medications, Mr. Andujar was compliant and law-abiding." <u>Id.</u> at 6.

Dr. Spiers further notes that while incarcerated from September 2000 through November 2001, following his earlier federal conviction (United States v. Andujar, Criminal No. 00-10036-NG), Andujar was treated with lithium to stabilize his mood prior to being placed on supervised release in November 2001.[2]  Upon commencing supervised release, Andujar was treated at Spectrum House where he followed up regularly with appointments and continued taking his medications.  Id.  The PSR elaborates on Andujar's mental health treatment on supervised release and his response to that treatment:

> The defendant was referred to Spectrum Health Systems . . . for combined out-patient treatment to address his substance abuse, mental health, and domestic violence history.  He participated in weekly individual sessions for a period of one year.  Monthly Treatment Reports to the Probation Office consistently reflected that the defendant was on time for appointments and in compliance with treatment, and improving coping and stress management skills without the use of drugs or alcohol. . . .  During this period and continuing through 2003, the defendant also underwent lithium therapy for his bipolar disorder, under the supervision of Dr. Elzira DeOliveira . . . .  The defendant reports that he found counseling to be helpful, but that it was stressful to attend sessions on a weekly basis, and he would have preferred going twice per month instead.

PSR¶104.

Dr. Spiers explains that "Mr. Andujar's bipolar disorder remained fairly stable during his supervised release," and that records maintained by Prescott Health Centre show that, in June 2004, the defendant presented as "well groomed, (with) good eye contact, speech was fluent, not pressured, (and) thought process is logical without paranoia, without suicidal ideation, without hallucinations (and that he was) Awake, Alert + Oriented X 3."  Spiers Report at 6.  Records

---

[2] The PSR completed on July 5, 2001, in connection with Andujar's earlier federal prosecution ("2001 PSR") addressed Andujar's treatment while incarcerated awaiting sentencing.  See, e.g., 2001 PSR¶85 ("Mr. Andujar reported that since January 2001, he has been treated by a psychiatrist at Plymouth House of Corrections, who prescribes Anafranil for obsessive compulsive behavior and Lithium to regulate mood swings.").

further show that, "in July of 2004 . . . [Andujar's] lithium level was within normal limits, but when he was seen again in October, it had fallen out of the therapeutic range." Id. Andujar "failed to show for his next appointment at Prescott early in 2005, and [Dr. Spiers] suspects that Mr. Andujar was again becoming manic." Id. Dr. Spiers thus identifies no time between September 2000 and late 2004 or early 2005 when Andujar's bipolar disorder was untreated or when Andujar was manic. Dr. Spiers finds it notable that the early 2005 period when Dr. Spiers "suspects" Andujar was manic "preceded by only a few months his arrest on the charges currently pending before the court." Id.

Andujar filed the first false return that was part of this scheme in July 2001, while he was awaiting sentencing in connection with his earlier case and while, as Dr. Spiers recognizes, Andujar was receiving lithium treatment. Andujar filed the last false return in February 2003, shortly after discontinuing his weekly therapy sessions at Spectrum House and while still receiving lithium treatment.

## II. ARGUMENT

### A. Andujar's Mental Health Arguments

#### 1. Andujar did not suffer from diminished capacity

This Court should deny Andujar's motion for a diminished capacity departure because the motion is based on an erroneous premise: that Andujar committed his crimes while he was "inadequately medicated," Defendant's Sent. Mem. at 1, and "was symptomatic, i.e. manic," id. at 7. As detailed above and as recognized by the neuropsychologist who examined Andujar and reviewed his medical history, there is no basis for the assertion that the defendant was inadequately medicated or symptomatic. To

the contrary, the record before this Court indicates that, throughout the relevant period, Andujar was receiving lithium. Moreover, during the period when Andujar filed the great majority of the false returns at issue – i.e., from November 2001 through 2002 – he was also involved in weekly counseling sessions, which he consistently attended punctually. Thus, as a simple factual matter, Andujar cannot satisfy his burden of showing he is eligible for a departure. See United States v. Craven, 358 F.3d 11, 15 (1st Cir. 2004) (defendant bears burden of proving he is eligible for downward departure).

In addition to the fatal factual flaw in Andujar's argument, common sense and a review of the relevant case law demonstrate that Andujar did not suffer from diminished mental capacity, as defined in U.S.S.G. § 5K2.13, during the course of his scheme. In order to establish significantly reduced mental capacity under U.S.S.G. § 5K2.13, the defendant must demonstrate that she suffered from a "significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior the defendant knows is wrongful." U.S.S.G. § 5K2.13, cmt. n.1. The burden of proving causation rests on the defendant. United States v. Regan, 989 F.2d 44, 45 (1st Cir. 1993).

The complex nature of Andujar's scheme by itself undermines his claim the he was suffering from "a significantly reduced mental capacity" during the course of the scheme. U.S.S.G. § 5K2.13. See, e.g., United States v. Leandre, 132 F.3d 796, 805 (D.C. Cir. 1998) ("The mental acumen required for the planning, preparation, and execution of a crime is a logical starting place" for evaluating a defendant's cognitive capacity); United

States v. Goossens, 84 F.3d 697, 701 (4th Cir. 1996) (noting that the fact that defendant "was conscious enough of his conduct to encrypt the pornographic material on his computer to avoid detection" indicated "a high level of mental functioning on his part"); Regan, 989 F.2d at 46 (noting that defendant's skillful and comprehensive methods to divert bank funds demonstrated remarkable ability, not diminished capacity).

Andujar's filing of false tax returns in a manner that took advantage of his expertise in tax matters, including his maximizing of earned income credits, demonstrates mental acumen rather than significantly reduced mental capacity. Likewise, Andujar's use of more than one bank account to receive payments from the IRS and various addresses to receive refund checks and to avoid detection by the IRS shows that he was well aware that what he was doing was wrong and was able to control his behavior well enough to try to hide his crimes.

A review of additional case law further illustrates the point. Courts have denied motions for downward departures based on reduced mental capacity where the medical and psychological conditions present were much greater than or comparable to those exhibited by the defendant. See Goossens, 84 F.3d at 701 (holding that evidence, including psychological report diagnosing Axis I Dysthymic Disorder and Generalized Anxiety Disorder, did not support finding that defendant suffered from significantly reduced mental capacity); United States v. Johnson, 979 F.2d 396, 400-401 (6th Cir. 1992) (finding that "severe adjustment disorder" was not sufficiently unusual to warrant departure); United States v. Janusz, 986 F.Supp. 328, 330 (D. Md. 1997) (holding that defendant was not entitled to a downward departure where psychiatrist stated that

defendant's depression "was severe enough to have caused a change in her normal impulse control and judgment," but evidence showed that she was capable of orchestrating embezzlement scheme that escaped detection for a number of years).

        2.      <u>Andujar did not suffer from diminished capacity</u>

Under U.S.S.G. § 4A1.1(d) "[t]wo points are added [to the defendant's criminal history score] if the defendant committed any part of the instant offense (<u>i.e.</u>, any relevant conduct) while under any criminal justice sentence, including probation, parole, <u>supervised release</u>, [or] <u>imprisonment</u>." U.S.S.G. § 4A1.1, cmt. n. 4 (emphasis added). It is undisputed that Andujar started his fraud scheme while imprisoned under a sentence of this Court and continued it while on supervised release. Moreover, the record shows that he was receiving treatment for his bipolar disorder and was asymptomatic during that entire period. There is thus no merit to Andujar's assertion that his criminal history score should not reflect the two points required under § 4A1.1(d).

    B.    This Court Should Determine Loss Amount In Accordance With The Advisory Guidelines

Andujar objects to inclusion of uncharged conduct in the calculation of loss. Defendant's Sent. Mem. at 10-11. His principal objection appears to be that inclusion of uncharged conduct in the loss amount runs afoul of <u>Apprendi</u> and its progeny, including Justice Stevens's opinion in <u>United States v. Booker</u>, 543 U.S. 220 (2005). <u>Id.</u> at 1. However, the defendant cites no appellate decision, and the government is aware of none, that supports the proposition that <u>Booker</u> affects how this Court is to apply the relevant

conduct Guideline, U.S.S.G. § 1B1.3. Indeed, the First Circuit has explained that it is not unconstitutional for this Court to find facts necessary to determination of the appropriate Guideline range; rather, "[t]he Booker error is that the defendant's Guidelines sentence was imposed under a mandatory system." United States v. Antonakopoulos, 399 F.3d 68, 75 (1st Cir. 2005). Moreover, the First Circuit has rejected an Apprendi-based argument similar to that advanced by Andujar, i.e., that permitting the Court to determine sentencing enhancements encroaches on the jury's role. United States v. Yeje-Cabrera, 430 F.3d 1, 23 (1st Cir. 2005); and see Defendant's Sent. Mem. at 10-11. As the court stated in Yeje-Cabrera,

> The district court post-Booker may determine drug quantity for purposes of sentence enhancements under the Guidelines. . . . The district . . . could (and should) have found [the defendant] responsible for the amount of cocaine established by a preponderance of the evidence against him--though of course, the ultimate sentence may not exceed the statutory maximum of 20 years.

Id.

More recently, the First Circuit reiterated that Booker did not change how the guideline range is determined:

> Under United States v. Booker, 543 U.S. 220 [2005], it remains (as before Booker) for the judge to determine the factual basis for an enhancement . . . so long as the statutory ceiling is not raised. . . . Booker alters the equation only by making the guidelines advisory.

United States v. O'Brien, 435 F.3d 36, 41 (1st Cir. 2006)(citations omitted).

Thus, as before Booker, this Court must determine the appropriate loss amount in this case by applying the Guidelines, including the relevant conduct Guideline. See, e.g., United States v. Flores-Seda, 423 F.3d 17, 20-21 (1st Cir. 2005)(holding, post-Booker, that it is not clear error for court to find loss amount greater than that charged in the indictment). In Flores-Seda, the First Circuit approved of the district court's reliance on relevant conduct to determine loss

amount for sentencing purposes.  Id. at 21 (citing U.S.S.G. § 1B1.3(a)(2), which defines "relevant conduct" to include "all acts . . . that were part of he same course of conduct or common scheme or plan as the offense of conviction."); see also Yeje-Cabrera, 430 F.3d at 23 (district court post-Booker may determine drug quantity for purposes of sentence enhancements under the Guidelines).

  In this case, the government will demonstrate at sentencing that all of the tax returns identified in the Government's Sentencing Memorandum were part of the same course of conduct and common scheme and plan by Andujar to defraud the government.  This Court should base its determination of the GSR on its "reasonable estimate of the range of loss, given the available information."  United States v. Brandon, 17 F.3d 409, 457 (1st Cir. 1994).

Conclusion

For the foregoing reasons, this Court should (1) deny the Defendant's Motion for a Downward Departure; (2) apply the criminal history enhancement under § 4A1.1(d) to reflect that the defendant committed his crimes while in custody and while on supervised release; and (3) hold the defendant liable for the full amount of loss as determined by the Court.

    Respectfully submitted,

    MICHAEL J. SULLIVAN
    United States Attorney

By:    /s/ John A. Capin
    ───────────────────
    JOHN A. CAPIN
    Assistant U.S. Attorney